UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| DOREEN SMITH, As Administrator of the Estate of Kenneth C. Smith, | ) ) ) | Case No: 1:13 CV 744 |
| Plaintiff | ) ) | |
| v. | ) ) | JUDGE SOLOMON OLIVER, JR. |
| ROGER JONES, | ) ) | |
| Defendant | ) ) | ORDER |

Currently pending before the court in the above-captioned case is Defendant Roger Jones's

("Defendant") Motion for Judgment as a Matter of Law, to Amend the Jury Verdict, or Alternatively,

to Order a New Trial ("Motion") (Mot., ECF No. 90).  Defendant requests that the court amend the

judgment as a matter of law, amend the jury verdict, or in the alternative, order a new trial with

respect to Plaintiff Doreen Smith's ("Plaintiff")[1] excessive force claim.  For the reasons that follow,

Defendant's Motion is granted in part and denied in part.

## I.  FACTS AND PROCEDURAL HISTORY

This case arises out of a traffic stop–precipitated by an incident at a bar in downtown

Cleveland–where Defendant, a police officer for the City of Cleveland, shot and killed Kenneth C.

_____

[1]      Doreen Smith, the Plaintiff in the above-captioned matter, is the grandmother of
the decedent, Kenneth C. Smith, and the administrator of his estate.

Smith ("Kenneth" or the "decedent") who was a passenger in the vehicle.  Plaintiff filed the instant

suit against Defendant in the Cuyahoga County Court of Common Pleas, alleging, pursuant to 42

U.S.C. § 1982, that Kenneth was subjected to excessive force when he was shot and killed by

Defendant.  Plaintiff also asserted the following Ohio state law claims: (1) willful, wanton, and

reckless conduct; (2) Ohio assault and battery; (3) wrongful death; and (4) survivorship action.  On

April 4, 2013, the case was removed to this court.  (Notice of Removal, ECF No. 1.)  Defendant filed

a Motion to dismiss, arguing that Plaintiff's Complaint should be dismissed because Plaintiff

(initially Shauna Smith, the decedent's mother) was not the court-appointed administrator of

Kenneth's estate, and thus lacked standing to initiate the instant matter.  (Def. Mot. to Dismiss, ECF

No. 11.)  Following the court's denial of Defendant's Motion (Order, ECF No. 21), Plaintiff

amended her Complaint on September 26, 2014, to reflect the correct administrator of the estate,

Doreen Smith.  Next, Plaintiff filed a Motion for Summary Judgment (ECF No. 23.), which the court

denied.  (Order, ECF No. 29.)

The case proceeded to trial on August 31, 2015.  The basic facts are that in the early morning

hours of March 10, 2012, Kenneth attended a party at Wilbert's Bar ("Wilbert's") while Defendant–

off-duty at the time–parked his car in the parking lot at East 9th Street in the City of Cleveland.

Positioned in close proximity to Wilbert's, Defendant witnessed a fight break out in front of the bar,

and subsequently heard someone fire a gun.  Defendant called the police dispatch, and then later 911,

and reported information regarding the fight.  Defendant also indicated that he saw the individual

who fired the gun get into the driver seat of a gold Saturn with other individuals.  After Defendant's

call, police officers eventually blocked the gold Saturn from continuing to drive.  Once the vehicle

was stopped, two on-duty Cleveland police officers covered the driver side and the front hood area

of the vehicle.  Defendant approached the passenger side of the vehicle where Kenneth was seated.

After yelling orders for Kenneth to show his hands, Defendant kicked out the passenger side window

and pointed his service firearm at Kenneth.

At trial, Defendant denied that he used excessive force in the shooting-death of Kenneth.

Instead, Defendant maintained that after Kenneth failed to comply with the order to show his hands,

he opened the door of the vehicle and attempted to pull Kenneth out of the car, while holding his

service firearm in one hand.  In the course of the struggle, Defendant contended that Kenneth pulled

away and reached his arm toward the center of the vehicle.  According to Defendant, fearing that

Kenneth was reaching for a gun as he leaned toward the vehicle's center console, he fired a single

round and killed Kenneth.  Last, Defendant maintained that after being shot once in the head,

Kenneth  walked a short distance from the car and then fell to the ground.

At trial, Plaintiff presented evidence supporting a different version of events.  Plaintiff

maintained that after kicking out the passenger side window, Defendant opened the passenger door,

pulled Kenneth out of the vehicle, and ordered Kenneth to get on the ground.  According to two of

Plaintiff's witnesses, Defendant shot Kenneth after he was already outside of the vehicle.  Plaintiff

also presented evidence that no trace of Kenneth's blood was found in the vehicle.  On the contrary,

Kenneth's blood was found some distance away from the vehicle.  Additionally, Plaintiff elicited

testimony from Dr. Joseph Felo, a forensic pathologist and the Deputy Medical examiner for the

Cuyahoga County Medical Examiner's Office, indicating that the type of gunshot wound that

Kenneth suffered would have prevented him from being able to make voluntary movements, such

as walking.  Rather, Dr. Felo testified that Kenneth's body would have relaxed and continued

moving in the direction that it was moving prior to the gunshot.

In resolving motions *in limine* filed before trial, the court determined that evidence of Smith's blood alcohol level was not admissible.  The court also denied Defendant's motions *in limine* seeking to exclude the testimonies of Plaintiff's experts Melvin Tucker and David Balash.   During trial, Defendant objected on various occasions to Melvin Tucker's testimony regarding generally accepted police practices and policies relating to excessive force and off-duty officers.  At the close of evidence, Defendant moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on the excessive force claim, essentially arguing that under the version of events that Defendant put forth at trial, Defendant did not, as a matter of law, use excessive force when he shot and killed Kenneth. The court denied the motion.

Prior to jury deliberation, Plaintiff voluntarily dismissed her Ohio Assault and Battery claim. Ultimately, the jury found in favor of Plaintiff on the remaining 42 U.S.C. § 1983 excessive force claim.  The jury awarded Plaintiff $1,000,000 in survivorship damages and $4,500,000 in wrongful death damages. (J. Entry, ECF No. 88.)

## II.  STANDARD OF REVIEW

### A. Rule 50(b)

Federal Rule of Civil Procedure 50(b) states:

> **(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

**(1)** allow judgment on the verdict, if the jury returned a verdict;

**(2)** order a new trial; or

**(3)** direct the entry of judgment as a matter of law.

The "court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000). The court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmovant. *Id.* at 150. The court may neither make credibility determinations nor weigh the evidence. *Id.* Thus, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe," but give credit to evidence favorable to the moving party "that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Id.* at 151.

### B. Rule 59(a)

Federal Rule of Civil Procedure 59(a) provides that a court may grant a new trial "after a jury trial, for any of the reason for which a new trial has heretofore been granted in an action at law in federal court." Rule 59(a) has been interpreted to require a new trial: only "when the jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the [clear] weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 414 (6th Cir. 2012) (internal citations omitted; alteration in original).

### C. Rule 59(e)

Federal Rule of Civil Procedure 59(e) permits a party to file a motion to alter or amend a judgment.  Fed. R. Civ. P. 59(e).  The Sixth Circuit has also held that district courts may treat a motion to reconsider as a motion to alter or amend a judgment pursuant to Rule 59(e). *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008); *Smith v. Hudson*, 600 F.2d 60, 62-63 (6th Cir. 1979) ("a motion which asks a court to vacate and reconsider, or even reverse its prior holding, may properly be treated under Rule 59(e) as a motion to alter or amend a judgment.").

District courts may grant a Rule 59(e) motion to amend or alter judgment for the following reasons: (1) to correct a clear error or law; (2) to address newly discovered evidence; (3) to address an intervening change in controlling law; or (4) to prevent manifest injustice.  *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 808-09 (N.D. Ohio 2010) (citing *Gencorp, Inc. v. Am. Int'l Underwriters Co.,* 178 F.3d 804, 834 (6th Cir. 1999)).  While "the Sixth Circuit has not precisely defined 'clear error' in the context of Rule 59(e) analysis, courts within other circuits have clearly indicated that a high standard applies."  *Id.* (collecting cases). The "manifest injustice" ground for Rule 59(e) "appears to be a catch all provision," but "it is not meant to allow a disappointed litigant to attempt to persuade the court to change its mind."  *Id.*  Last, Rule 59(e) "'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) (internal citation omitted).

### III. LAW AND ANALYSIS

### A. Dismissal Pursuant to Federal Rule of Civil Procedure 12(b)

In the instant Motion, Defendant makes the naked assertion that because the above-captioned matter should have been dismissed with prejudice, the court must now vacate the jury verdict and

-6-

dismiss the matter with prejudice. In support of his argument, Defendant "expressly incorporate[s]" his Motion to Dismiss (ECF No. 11). (Mot. at 3, ECF No. 90.) Defendant further argues that because the initial Complaint naming Shauna Smith as Plaintiff was a "legal nullity," the court erred in allowing Plaintiff to amend her Complaint to reflect Doreen Smith, the correct administrator of the decedent's estate. (*Id.* at 3-4.) To the extent that Defendant seeks judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), the court is not persuaded. A party seeking to renew a motion for judgment as a matter of law pursuant to Rule 50(b) is limited to issues that were previously raised in the initial Rule 50(a). *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 492 (6th Cir. 2008)(citing *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997)). In other words, "a post-trial motion for judgment as a matter of law 'is not available at anyone's request on an issue not brought before the court prior to submission of the case to the jury.'" *Id.*

Here, Defendant made an oral Rule 50(a) motion at the close of evidence.[2] Defendant moved for judgment as a matter of law on Plaintiff's excessive force claim, essentially arguing that an officer is justified, as a matter of law, in using deadly force where: (1) the individual reaches for a firearm that is nearby; and (2) where the officer possessed a reasonable belief that the individual reached for the firearm.[3] (Tr. at 204, ECF No. 91.) Defendant contended that if the jury believed the particular

---

[2]  At trial, Defendant indicated that he was bringing a Rule 50(b) motion rather than a Rule 50(a) motion. While the record is not clear, the court assumes that by referencing Rule 50(b), Defendant meant Rule 50(a)(1)(B) as opposed to Rule 50(b), as Defendant could not renew a motion that he never before argued.

[3]  In support of his argument, Defendant referenced a Sixth Circuit case "Bickerstaff." However, Defendant did not provide the court with the complete case name nor a case citation during his oral motion. (Tr. at 205, ECF No. 91.) At no time following the trial has Defendant provided the court with this information. After conducting its own research, the court has been unable to identify the case to which Defendant referred.

-7-

set of facts that he set forth–that Defendant used deadly force and killed Kenneth based on his reasonable belief that Kenneth reached for the gun–then Defendant's actions could not constitute excessive force as a matter of law. (*Id.*) Thus, Defendant sought judgment as a matter of law on that particular set of facts. (*Id.* at 205-06.) Plaintiff presented her argument as to why the constitutional claim should go to the jury. Ultimately, the court found that there remained genuine issues of material fact regarding how Defendant came to use deadly force and kill Kenneth Smith, and thus denied the motion. (*Id.* at 206.)

Defendant did not raise any other arguments on his Rule 50(a) motion. Because Defendant failed to raise any arguments regarding standing or the validity of the Complaint during his Rule 50(a) motion, Defendant is now precluded from raising the issues in his renewed Motion for Judgment as a Matter of Law. *See Hometown Folks, LLC v. S & B Wilson*, 643 F.3d 520, 527 (6th Cir. 2011) (citing *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2009)). Accordingly, Defendant's renewed Motion for Judgment as a Matter of Law (ECF No. 90) is denied.

To the extent that Defendant argues that, pursuant to Federal Rule of Civil Procedure 59(e), the court must reconsider its ruling on Defendant's Motion to Dismiss, the court disagrees. Although "Rule 59(e) permits a court to alter or amend a judgment, . . . it 'may not be used to relitigate old matters.'" *Exxon Shipping Co.*, 554 U.S. at 486 n.5 (internal citation omitted). The court thoroughly addressed the issues of standing and Plaintiff's request for leave to amend the Complaint in its Motion to Dismiss Order. (ECF No. 21) Furthermore, beyond "expressly incorporat[ing]" his Motion to Dismiss, Defendant has identified no authority indicating that the court has made a clear error of law. In fact, Defendant has made no effort whatsoever to establish that the court's ruling warrants reconsideration under *any* of the grounds supporting amendment or alteration under Rule

-8-

59(e). As Plaintiff merely rehashes arguments that the court already addressed in its Motion to Dismiss Order, the court declines to reexamine these issues in the present motion.

## B. New Trial Motion

### 1. *Batson* Objection

Defendant argues that the court improperly sustained Plaintiff's *Batson* objection, because the court's conclusion that Defendant's reason for striking Potential Juror Number Five was "not good" failed to meet the *Batson* standard. (Mot. at 4, ECF No. 90.) Plaintiff disagrees, and contends that the court went through each and every element required by *Batson*, and properly concluded that Defendant's stated reason for peremptorily striking Potential Juror Number Five was pretext for eliminating her based on her race. (Opp'n at 6, ECF No. 95.)

In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Because "the racial discrimination in the selection of jurors" is not a harm that is limited to the criminal sphere, the Supreme Court has extended *Batson* to civil cases. *See Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 630 (1991) (concluding that "courts must entertain a challenge to a private litigant's racially discriminatory use of peremptory challenges in a civil trial."). Addressing a *Batson* challenge requires a three-part analysis. First, "the district court must [] determine whether 'the opponent of a peremptory challenge has made out a prima facie case of racial discrimination." *Paschal v. Flagstar Bank*, 295 F.3d 565, 574 (6th Cir. 2002) (citing *Purkett v. Elem*, 514 U.S. 765, 767 (1995)). Where a prima facie case has been established, second, "'the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation.'" *Id.* Finally, "[i]f a race-neutral explanation is tendered, the trial court must then decide whether the opponent of

-9-

the strike has proved purposeful discrimination." *Id.* (citing *United States v. Mahan,* 190 F.3d 416, 424 (6th Cir. 1999)).  With respect to burdens, the Sixth Circuit instructs that "[t]he three-step analysis  [ ] places a burden on the opponent of the peremptory strike, the proponent of the peremptory strike, and the trial court.  During step two, the burden of *production* shifts to the proponent of the peremptory strike; however, the burden of persuasion regarding racial motivation never shifts from the opponent of the strike." *United States v. McAllister*, 693 F.3d 572, 578 (6th Cir. 2012) (citing *United States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008)).

To establish a prima facie case, the proponent of the strike must demonstrate each and every one of the following: "(1) [that the opponent] is a member of a cognizable racial group; (2) a peremptory challenge was employed to remove a juror of the [opponent's] race; and that (3) these facts, along with other relevant circumstances, raise an inference that the proponent of the peremptory challenge used the challenge to exclude a prospective juror because of his or her race." *United States v. McAllister*, 693 F.3d at 578-79 (internal citation omitted).  To satisfy the second step of the *Batson* inquiry, the proponent's race-neutral explanation for the peremptory strike "need not be particularly persuasive or plausible."  *Id* at 579. (citing *United States v. Torres-Ramos*, 536 F.3d 542, 559 (6th Cir. 2008)).  Last, the third step requires the court to "assess the plausibility of the proponent's race-neutral reason in light of all evidence with a bearing on it."  *Id.* at 580 (internal citation omitted).  In other words, the district court must "'assess the [strike proponent's] credibility under all of the pertinent circumstances [and] . . . weigh the asserted justification against the strength of the [strike opponent's] prima facie case under the totality of the circumstances.'"  *Paschal*, 295 F.3d at 574 (internal citation omitted; alterations in original); *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)

-10-

(noting that, at the third step, "the issue comes down to whether the trial court finds the [proponent's] race-neutral explanations to be credible.").

Upon a review of the record, the court finds that it did not err in sustaining Plaintiff's *Batson* objection. The court and counsel for the parties questioned a venire of thirty-six individuals[4], eight of whom were African-American.[5] At the conclusion of voir dire, counsel for Defendant peremptorily challenged Potential Jurors Numbers Five and Eleven, both of whom were African-American. Because Potential Jurors Five and Eleven constituted two of the three African-American potential jurors who most likely would have been seated on the eight-person jury, counsel for Plaintiff raised *Batson* challenges for both. The court denied Plaintiff's *Batson* challenge with respect to Potential Juror Number Eleven, finding the strength of Plaintiff's prima facie case did not outweigh the credibility of Defense counsel's race-neutral explanation.

With respect to Potential Juror Number Five, counsel for Plaintiff argued that there were very few African-American jurors on the panel. Based on the nature of the jury selection process employed by the court, there were only three African-American potential jurors who had a realistic prospect of serving on the jury panel. Thus, Plaintiff argued that the prospect of striking two out of

---

[4]     The court's jury selection process begins with the court and counsel for the parties questioning the entire venire. At the conclusion of questioning, potential jurors are eliminated from the venire for cause, if necessary. Following the for-cause eliminations, counsel for the parties each have an opportunity to exercise three peremptory strikes. Once counsel for the parties have exercised their peremptory strikes, the court selects, in ascending numerical order, the first eight potential jurors remaining in venire. Due to the practical limitations of the court's jury selection process, potential jurors with high numbers are unlikely to be selected to serve on the final jury panel.

[5]     Among the thirty-six person venire, the African American potential jurors were numbers 2, 5, 11, 22, 30, 31, 33, 35.

the three African-Americans is impermissible.  Given that Plaintiff and the decedent are African-American[6], and that African-American Potential Juror Number Five expressed an ability to be fair and impartial, and yet was selected for a peremptory strike, the court properly concluded that counsel for Plaintiff established a prima facie case that the peremptory strike was based on Potential Juror Number Five's race.

Having established a prima facie case, the court turned next to counsel for the Defendant for his race-neutral explanation.  *See Paschal*, 295 F.3d at 574.  In support of his peremptory strike, Defendant's counsel pointed to Potential Juror Number Five's response to a jury questionnaire question requesting that potential jurors list the ages and occupations of any children that they have. In response to that question,  Potential Juror Number Five listed a child who died at age 44.  Counsel for the Defendant also noted that Potential Juror Number Five also made comments about racial profiling in her questionnaire.  However, Defendant's counsel acknowledged that these comments did not concern him because Potential Juror Number Five explained her concerns regarding the racial profiling issue quite well, and seemed to harbor no hostile feelings toward police.  Thus, Defendant's counsel's decision to peremptorily strike Potential Juror Number Five rested solely on the fact that she had a deceased, adult child.  During the colloquy between the court and counsel for the parties, Plaintiff's counsel pointed out that Potential Juror Number Five never indicated during voir dire that her child's death was an issue, and was never questioned by either counsel on the topic.

---

[6]     Counsel for the Defendant pointed out during the *Batson* colloquy and in his briefing that Defendant is also African-American.  This fact, however, does not change the court's conclusion that counsel for Plaintiff established a prima facie of racial discrimination.

Ultimately, the court concluded that counsel for Defendant stated a race-neutral explanation for peremptorily striking Potential Juror Number Five.  Because step two of the *Batson* analysis requires only that the explanation offered be "'minimally persuasive,'" *Kimbrel*, 532 F.3d at 466, the court did not err in drawing this conclusion, and properly moved to step three of the *Batson* analysis.[7] In making its final determination, the court evaluated the credibility of counsel for the Defendant, as well as Potential Juror Number Five's demeanor.  *See Snyder v. Louisiana*, 552 U.S. 472, 476 (2008) (noting that "'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.'").  After "weigh[ing] [Defendant's counsel's] asserted justification against the strength of the [Plaintiff's counsel's] prima facie case under the totality of the circumstances,'" *Paschal*, 295 F.3d at 575 (internal citation omitted), the court sustained Plaintiff's *Batson* challenge.  Contrary to Defendant's assertion that the court hastily sustained the challenge because Defendant's counsel's race-neutral reason was "not good," the court based its determination on several explicit factual findings.  *See McCurdy v. Montgomery Cty.*, 240 F.3d 512, 521 (6th Cir. 2001) (internal citation omitted) (noting that district courts "must 'explicitly adjudicat[e] the credibility of the non-moving or challenging party's race-neutral explanations.'").

---

[7]  Defendant suggests that at this point the court merely concluded that Defendant's counsel's race-neutral reason was "not good."  However, the record indicates that this is not true.  While the court did indicate that the race-neutral reason was troubling, it went through each and every step required by *Batson*, and also heard further arguments from the parties before making its final determination.  Although the court's application of the *Batson* test may not have been ideal, the court did not err.  *See Paschal*, 295 F.3d at 576 (noting that while the district court may have "prematurely stated its conclusion before fully articulating the *Batson* analysis, the district court did not commit an error of law in applying the test.").

In particular, the court noted that nothing in Potential Juror Number Five's background, nor any of the questioning during voire dire, suggested that her adult-child's death would prevent her from begin able to serve as a juror. The court found not credible the suggestion that simply because Potential Juror Number Five's child died at age forty-four, she would not be able to serve impartially in cases involving death. This was especially so where Potential Juror Number Five never mentioned the issue during voir dire. Further impacting the credibility of Defendant's counsel's race-natural explanation was the fact that counsel for the Defendant neglected to affirmatively raise the issue during voir dire, despite having the concern that her deceased adult child would impinge upon her ability to serve an impartial juror. While Defendant argues that he did not explore the issue of Potential Juror Number Five's deceased adult child because it was an "obviously painful topic," the court finds that the argument is not well-taken. It is not obvious that it would have been a painful topic to Potential Juror Number Five, nor is it obvious that it would have been relevant to her service. Although counsel was certainly not required to inquire into every issue reflected on Potential Juror Number Five's jury questionnaire, this court finds, like the court in *Paschal*, that Defendant's failure to ask critical questions such as, the adult-child's age when she or he died, the adult child's cause of death, etc., further undermined the credibility of Defendant's race-neutral explanation. *See Paschal*, 295 F.3d at 576 (noting that one of the district court's articulated reasons for believing that the strength of plaintiffs' prima facie case outweighed Defendant's asserted justification, was the fact that Defendant did not ask the potential juror any questions about the topic for which she was peremptorily struck). Because, under the totality of the circumstances, the court found that the strength of Plaintiff's prima facie case outweighed the credibility of Defendant's counsel's race-neutral explanation for peremptorily striking Potential Juror Number Five, the court did not

improperly sustain Plaintiff's *Batson* challenge.  Accordingly, Defendant is not entitled to a new trial on this ground.

### 2. Admission of Expert Testimony and Testimony Regarding Model Police Policies and Procedures

#### a. Expert Witness David Balash

Defendant next argues that the court should grant him a new trial because it erred in denying Defendant's Motions *in Limine* regarding the testimony of David Balash ("Balash") (ECF No. 42). Beyond his "express reincorporat[ion]" of his Motion *in Limine* (ECF No. 42), Defendant offered no further support for his argument.

Although Defendant's purpose in "expressly reincorporat[ing]" his Motion *in Limine* (ECF No. 42) is not entirely clear, the court nonetheless construes this as a request for reconsideration of the court's ruling on the Motion, pursuant to Rule 59(e).  As explained *supra*, "Rule 59(e) . . . 'may not be used to relitigate old matters.'"  *Exxon Shipping Co.*, 554 U.S. at 486 n.5 (internal citation omitted).  Here, prior to the trial, the court spent considerable time on the open record stating the reasons for its ruling on Defendant's Motion *in Limine*.  The court noted that Defendant's Motion essentially raised a *Daubert* challenge two weeks prior to trial, in spite of the court ordering parties to submit motions *in limine* addressed to the admissibility of expert testimony no later than ten days after the resolution of all dispositiove motions.  (Order, ECF No. 30).

Notwithstanding Defendant's disregard of the court's Order, the court reviewed Balash's qualifications and determined that Balash qualified as an expert, and that based on his background, Balash had relevant information regarding the shooting-death of the decedent to impart to the jury. The court also concluded that disagreements about Balash's opinions regarding the distance and angle of the fatal gunshot wound and the stippling that occurred as a result of the gunshot wound did

-15-

not warrant exclusion of the testimony altogether. Rather, such disagreements were more suited to be brought out during a vigorous cross-examination. *See King v.Taylor*, 944 F. Supp. 2d 548, 552 (E.D. Ky. 2013) (quoting *Daubert v. Merrel Dow Pharm.*, 509 U.S. 579, 589 (1993)) (noting that "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.'"). As the Sixth Circuit has noted, "[w]hen an expert has been qualified, other evidence, including the testimony of other experts, that contradicts or undermines the expert affects the expert's credibility, not his qualifications to testify." *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994). Accordingly, because Defendant has failed to provide *any* ground upon which the court's prior ruling warrants reconsideration, the court declines to reexamine the issue further.

### b. Testimony Regarding Police Policies and Procedures

Defendant next argues that the court erred in denying his Motion *in Limine* to exclude the testimony of Melvin Tucker ("Tucker") (ECF No. 38), denying his Motion *in Limine* to exclude evidence of general police policies, orders, and training, and overruling his objections regarding the admission of such evidence at trial. The gravamen of Defendant's argument is that generally-accepted police practices, and possible violations thereof, is neither persuasive nor relevant to the determination of whether Defendant used excessive force in the shooting death of Kenneth. (Mot. at 6, ECF No. 90.) In opposition, Plaintiff argues that although a violation of general police orders and policies does not necessarily constitute a constitutional violation, it does not follow that such evidence is never admissible for any purpose. (Opp'n at 6-7, ECF No. 95.)

It is axiomatic that a violation of police procedure does not necessarily rise to a constitutional violation. *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). However, as noted by a sister court

-16-

in *King v. Taylor*, "the Sixth Circuit in *Smith* did not rule that [law enforcement standards] could not be considered by a fact finder, only that they cannot be understood to define the constitutional boundaries by which an officer's conduct is to be judged." 944 F.Supp. 2d at 555 (citing *Alvarado v. Oakland*, 809 F. Supp. 2d 680, 690 n.5 (E.D. Mich. 2011)).

Here, the court finds that the admission of Tucker's testimony regarding general police policies, orders, and procedures was not improper. At trial, over Defendant's objection, Tucker testified regarding the generally-accepted national standards for off-duty actions by a law enforcement officer and police use of force. Tucker opined that three of Defendant's actions were consistent with the generally-accepted police standards for off-duty officers and the use of force, and that four of Defendant's actions were inconsistent with the standards. (Tr. 109-116, ECF No. 91.) However, on no occasion during his testimony did Tucker opine, implicitly or explicitly, as to whether Defendant's violation of general police policies constituted a constitutional violation.

Moreover, to alleviate any possible confusion by the jury, the court instructed the jury during Tucker's direct examination that a violation of police policies and procedures is not dispositive in and of itself. (Tr. at 117:6-22). Additionally, during the jury charge, the court instructed the jury as follows:

> "Local law enforcement policies, standards, guidelines, and training do not define the constitutional boundaries by which a Defendant's conduct is to be judged. Defendant's compliance with, or violation of, department policy is not conclusive as to whether or not Kenneth Smith's Fourth Amendment rights were violated.

> However, law enforcement policies, standards, guidelines, and training are among the facts and circumstances confronting Defendant at the time, as such, you may consider these facts when making your determination as to whether Defendant's actions were objectively reasonable under the circumstances."

-17-

(Jury Instr. No. 17, ECF No. 82.) Generally, courts "presume[]if properly instructed by judges and guided by counsel, juries are capable of considering evidence for one purpose but not another." *Washington v. Hofbauer*, 228 F.3d 689, 705 (6th Cir. 2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). Moreover, courts "must presume that juries follow their instructions." *Id.* at 706. Accordingly, considering the court's curative instruction, which dispelled any notion that a violation of generally-accepted police policies constitutes a *de facto* constitutional violation, the court concludes admitting such evidence does not constitute a ground for a new trial.

### 3. Exclusion of Evidence of the Decedent's Intoxication

Defendant also argues that the court erred in excluding evidence of Kenneth's intoxication. (Mot. at 7, ECF No. 90). Specifically, Defendant contends that evidence of Kenneth's intoxication was relevant to determining whether Defendant's actions were reasonable under the circumstances. (*Id.*) However, in raising the relevancy issue, Defendant fails to address the ground upon which the court made its ruling. Defendant wholly ignores the fact that the court did not base its ruling on the issue of relevancy. On the contrary, at trial, the court made clear that the exclusion of evidence of the decedent's intoxication was based on Defendant's failure to provide adequate notice of his intent for Dr. Felo to give expert testimony interpreting the report's contents. (Tr. at 33, ECF No. 79.)

Rule 26 mandates that parties make expert disclosures "at the times and in the sequence that the court orders" or at least 90 days before the date set for trial. Fed. R. Civ. P. 26. With respect to expert witnesses who are not required to provide a written report, Rule 26(a)(2)(C) instructs that "the disclosure must state: . . . (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Parties that fail to comply with the mandates of Rule 26,

face sanctions under Rule 37(c)(1), which provides for the exclusion of the information or witness at trial "unless the failure was substantially justified or is harmless."   Fed. R. Civ. P. 37; *see also Vaughn v. City of Lebanon*, 18 F. App'x. 252, 262-63 (6th Cir. 2001).

Here, Defendant waited until the day that trial commenced to indicate that he intended to call Dr. Felo to give expert testimony regarding the meaning and effect on the decedent of the 0.154 g/dL ethanol value reflected in the toxicology report.   While it is true that Defendant attached the toxicology report to its Opposition to Plaintiff's Motion for Summary Judgment (Opp'n Mot. Summ. J., Ex. F, ECF No. 26), the report itself cannot be construed as proving notice that *Dr. Felo* would provide expert testimony on the contents of the report.   First, Dr. Felo is a forensic pathologist and the Deputy Medical examiner for the Cuyahoga County Medical Examiner's Office, not a toxicologist.  (Tr. at 4, ECF No. 79.)   Second, nothing in the report indicates that Dr. Felo either composed the report or supervised the report's creation; on the contrary, John F. Wyman, PhD., Chief Forensic Toxicologist, signed off on the report.  (Opp'n Mot. Summ. J., Ex. F at 5, ECF No. 26.)

Moreover, Defendant's untimely notice deprived Plaintiff of any opportunity to discover several key variables regarding Dr. Felo's expert testimony on the ethanol level reflected in the toxicology report.   For example, there was no advanced opportunity to determine whether Dr. Felo had the proper background and expertise to opine on such issues.[8]  Furthermore, nothing in the toxicology report  provides any explanation as to the meaning of 0.154 g/dL ethanol, the amount of

---

[8]        Though cases vary, most support "two broad propositions that before a witness is permitted to testify as to the findings or results of a scientific test to determine the alcoholic content of blood," the witness must "be properly qualified as an expert" in not only "making the test," but also qualified to testify as to the "relationship between alcoholic content of the blood and intoxication generally.*"  Qualification as an Expert to Testify as to Findings or Results of Scientific Test to Determine Alcoholic Content of Blood*, 77 A.L.R. 2d 971.

alcohol that 0.154 g/dL ethanol constitutes, or physical effects that such a level of ethanol has on an individual like the decedent.  Aside from the toxicology report, which reflected nothing beyond the 0.154 g/dL ethanol level, Plaintiffs had no knowledge prior to trial of what the "full range of Dr. Felo's opinions would be." (Tr. at 33:11-15, ECF No. 79.)

Though not binding on this court, *Hallett v. Richmond*, No. 05 C 50055, 2009 WL 5125628, *3 (N.D. Ill May 15, 2009), is instructive.  Similar to the instant matter, the court in *Hallett* excluded defendant's expert witness testimony regarding a lab report reflecting the presence of alcohol and drugs in plaintiff's system because defendant failed to disclose that plaintiff's treating physician, or any other witness, would give testimony interpreting the information contained in the report.  *Id.* Accordingly, the court concluded that allowing Defendant to introduce its eleventh-hour expert witness testimony regarding the results of the toxicology report would have been prejudicial to Plaintiff.  The court concurs with the *Hallett* court's reasoning, and reaffirms its decision to exclude the evidence of Kenneth's intoxication.  Thus, the court finds that it did not err in excluding evidence of decedent's intoxication.

### 4. Jury Verdict

Defendant also contends that the jury verdict is against the manifest weight of the evidence, and thus, the court should set the verdict aside and order a new trial.  (Mot. at 8, ECF No. 90.)  In his Motion, Defendant argues that Plaintiff's only eye witness, Kayla Hodges ("Hodges") changed her story in order to make it consistent with the evidence produced at trial.  (*Id.*)  In opposition, Plaintiff contends that not only is the verdict consistent with Kayla Hodges's testimony, which is corroborated by Alexis McRay's testimony, but that it is also supported by the physical evidence, and Dr. Joseph Felo's and Detective Tim Entenok's testimonies.

The Sixth Circuit has instructed that "when a district court determines that a verdict is against the weight of the evidence, that court has a duty to grant a new trial in order to prevent a miscarriage of justice." *Reynolds v. Green*, 25 F. App'x 256, 259 (6th Cir. 2001) (internal quotations and citations omitted); *Holmes v. City of Massillon*, 78 F.3d 1041, 1047 (6th Cir. 1996).  To make this determination, "the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence." *J.C. Wyckoff & Assocs. v. Standard Fire Ins., Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991).  However, the court also cautions that "new trials are not to be granted on the ground[] that the verdict was against the weight of the evidence 'unless the verdict was unreasonable." *Reynolds*, 25 F. App'x at 259 (internal quotations and citations omitted).

Here, Defendant does not point to evidence that suggests that the jury verdict is against the manifest weight of the evidence.  Although at certain points throughout her testimony, Hodges contradicted her prior sworn testimony, the contradictions do not negate the fact that other evidence presented at trial supports the jury's verdict.  First, similar to Hodges, Plaintiff's eyewitness Alexis McRay testified that Kenneth was outside of the car when Defendant shot and killed him.  Second, Dr. Felo, a forensic pathologist and Deputy Medical Examiner for the Cuyahoga County Medical Examiner's Office, testified that the type of head gunshot wound that Kenneth suffered would have caused Kenneth's body to "essentially . . .relax." (Tr. at 10:2-6, ECF No. 79)  Thus, if Kenneth were leaning forward, he would continue to fall forward.  (*Id.*)  Likewise, if Kenneth were standing, he would collapse.  (*Id.*)  At trial, Defendant argued that Kenneth was shot inside of the vehicle as he reached for the firearm near the vehicle's center console, and then after being shot, walked a short distance from the vehicle.  However,  Dr. Felo testified that an individual suffering from the type of

wound that Kenneth had would be unable to walk, and would "drop[] toward gravity." (*Id.* at 10:7-9.) Dr. Felo also confirmed that if the individual inside of the vehicle were moving in the direction of the center console, and the gunshot were fired at the vehicle's passenger doorway, the individual would have continued leaning or falling forward toward the center console. (*Id.* at 10:1-21).

Last, Dr. Felo also testified that blood would immediately come out of the hole that the gunshot created in the decedent's head. (Tr. at 10:22-11:3, ECF No. 79.) When considered in conjunction with Detective Timothy Entenok's testimony that Kenneth's blood was not found in the vehicle, and that the only trace of Kenneth's blood at the scene of the incident was located in a pool a distance away from the car, the jury could have reasonably concluded that Kenneth was shot outside of the car, away from the gun located on the vehicle's center console. While Defendant argues that four officers on the scene during the incident testified that they saw the decedent removed from the vehicle after Defendant shot him, the officers' testimony is not sufficient to cause the verdict to be against the weight of the evidence. After comparing opposing proofs and weighing the evidence, the court finds that the jury reasonably could have found for Plaintiff. Thus, the court concludes that the verdict is not against the weight of the evidence, and denies Defendant's Motion.

### 5. The Jury Award

Defendant last argues that the jury's award was excessive and should be vacated or modified by the Court. (Mot. at 8, ECF No. 90.) With respect to survivorship damages, Defendant contends that Kenneth "essentially died instantly" after Defendant shot him, and thus did not experience conscious pain and suffering. (*Id.*) With respect to wrongful death damages, Defendant argues that the award is not supported by the evidence because Plaintiff failed to produce an economic expert to testify to the decedent's future earning power. (*Id.*)

Generally, "[a] jury verdict should not be remitted by a court unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for the party's loss." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004) (citing *Gregory v. Shelby Cty.*, 220 F.3d 433, 443 (6th Cir. 2000)).  Maintaining the jury award is favored "[u]nless the award is (1) beyond the range supportable by proof or (2) so excessive as to shock the conscience, . . . or (3) by result of a mistake." *Id.* (citing *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 156 (6th Cir. 1996)).  In other words, "[a] trial court is within its discretion in remitting a verdict only when, after reviewing all of the evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice, or is so excessive or inadequate as to shock the judicial conscience of the court." *Id.* at 905-06 (citing *Gregory*, 220 F.3d at 443).

First, the jury awarded $1,000,000 in survivorship damages to Plaintiff as compensation for both the economic losses and non-economic losses suffered by the decedent.  In determining the award,  the jury considered, among other things, Kenneth's conscious pain and suffering and emotional and mental harm during the events at issue, as well as expenditures that may have been incurred as a result of Kenneth's death.  (Final Jury Instrs. at 28, ECF No. 82.)  Although Defendant argues, based on the testimony of Dr. Felo, that Kenneth "would have essentially died instantly" after he was shot, the court is not persuaded.  Dr. Felo did not testify that Kenneth "would have essentially died instantly."  On the contrary, Dr. Felo testified that the gunshot wound would have rendered Kenneth unable to make "purposeful movement."  (Tr. at 9:14-18, ECF No. 79.)

Moreover, record evidence suggests that Kenneth did not die instantly.  ( Opp'n, Ex. C at 1, ECF No. 95-3.) (Cleveland EMS medical records indicate that the EMS crew encountered Kenneth at 3:03 a.m., and that he was still alive as of 3:10 a.m.)  Like the decedent in *Yancey v. Carson*, who

-23-

suffered a gunshot wound, bled, and was alive for some period after being shot, "'[o]ne simply cannot quantify the mental and physical pain and suffering such an experience would cause, and thus [the court] cannot conclude that the evidence does not support the award[].'" Nos. 3:04-CV-556, 3:04-CV-610, 2008 WL 687510, at *5 (E.D. Tenn. Mar. 12, 2008) (quoting *Bickel,* 96 F.3d at 156) (finding that "a reasonable jury could have found that decedent's pain and mental suffering prior to his death were worth the entire $5,000,000 verdict.").

Plaintiff also introduced evidence of medical treatment, and other expenditures resulting from Kenneth's death. Specifically, Kenneth was billed $490.00 for the Cleveland EMS ambulance advance life support services and $11,121.00 from MetroHealth for emergency room services. (Opp'n, Ex. D at 1-2, ECF 95-4.) Accordingly the court finds that the award of $1,000,000 in survivorship damages is not beyond the range supportable by proof, so excessive as to shock the conscience, or by result of mistake.

Second, Plaintiff plead a wrongful death claim alongside her §1983 claim (First. Am. Compl. at ¶¶ 29-35, ECF No. 22.), and the jury awarded wrongful death damages in the amount $4,500,000.[9] The jury awarded wrongful death damages in a lump sum amount, thus the specific amount awarded for mental anguish, loss of consortium, and the decedent's future economic earning power is unknown. In determining the wrongful death award, the jury was instructed to consider the mental anguish and loss of society that Shauna Smith suffered as a result of the loss of her son. At trial,

---

[9]    At trial, Plaintiff moved to dismiss her Ohio Assault and Battery claim. Defendant did not object. The court granted Plaintiff's Motion and dismissed the claim with prejudice. However, there was no reference to her state Wrongful Death claim. Counsel for the parties reviewed and did not object to the final framing of the wrongful death and survivorship damages instructions.

-24-

several witnesses testified regarding the grave impact that Kenneth's death has had on his mother. LaShawn James ("James"), a close friend of Shauna Smith, testified that Shauna Smith was an amazing mother, that she and Kenneth had a very "unique" and close relationship, and that Kenneth was Shauna Smith's only child and a "special gift." (Tr. at 170-71, ECF No. 91.) James also testified that since Kenneth's death, Shauna Smith is "very withdrawn" and not at all the friend that she used to know. (*Id.* at 174:15-16.) Moreover, James noted that Kenneth's death has caused Shauna to lose her appetite, have migraines, and have mood swings. (*Id.* at 174:13-16.) Strikingly, James testified that while Shauna Smith was "normally very outgoing, very strong willed," since Kenneth's death, it appeared that her "spirit has been broken." (*Id.* at 174:13-16.)

Shauna Smith's testimony also reflects the devastating impact that the loss of Kenneth–her only child–has had on her life. Shauna Smith stated,

> "I never want anybody to experience what I'm experiencing, but I just feel like I'm a walking zombie every day. And that's why I try to keep myself looking presentable, because I don't want to look like I feel. I just lost my son and that was my life." (Tr. at 194:16-20, ECF No. 91.)

She also stated that she contemplated suicide because she no longer wanted to live, and that since Kenneth's death she has taken medication on a daily basis for anxiety and depression. (*Id.* at 196:2-6.) And while approximately three years have passed since Kenneth's death, Shauna Smith made clear that, though she thought things would be better, every day of her life is "terrible." (*Id.* at 196:11-18.)

Based on the testimony, the court finds that the Shauna Smith has suffered immensely and undoubtedly will continue to suffer as a result of her son's death. While it is impossible to put a precise value on Shauna Smith's mental anguish and loss of society, the court finds that the maximum amount the jury could reasonable find to be compensatory for her loss is $2,500,000.

-25-

With respect to the portion of wrongful death damages awarded in compensation for the loss of support for the reasonably expected earning capacity of the decedent, Defendant, without pointing to any case law whatsoever, argues that the wrongful award is excessive because Plaintiff failed to produce an economic expert.  (Mot. at 8, ECF No. 90.)  The court is not persuaded.  The Sixth Circuit has noted that an exact calculation of what the plaintiff could have earned but for the injury is not required."  *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 726 (6th Cir. 2012).  In fact, plaintiffs need not present expert testimony in order to recover future earnings damages.  *See Sahrbacker v. Lucerne Prods., Inc.*, 556 N.E.2d 497, 498 (1990).

While Plaintiff's case with respect to damages may have benefitted from the testimony of an economic expert, nevertheless, the court does not think that it is unreasonable to conclude that a young man like the decedent would have earned at least $500,000 throughout his lifetime.  The record supports this conclusion.  First, at the young age of twenty, Kenneth had already shown promise in the music industry.  Plaintiff presented evidence that Kenneth was an aspiring hip-hop artists, and received the Ohio Hip-Hop Awards 2012 Single of the Year award for his a record entitled "Dinner Date."[10]  (Opp'n, Ex. E, ECF No. 95-5.)  Moreover, Shauna Smith testified that an album that Kenneth created prior to his death was picked up and produced by RCB Records.  (Tr. at 186:24-182-191:14, ECF No. 91; Opp'n, Ex. E, ECF No. 95-5.)   Additionally, Martez Little ("Little"), a hip-hop artist and close friend of Kenneth, testified that Kenneth was "very witty,"

---

[10]     Kenneth, known in the music world as "Kenn Ball," recorded "Dinner Date" in conjunction with Martez Little ("Little"), known in the music world as "Tezo," a close friend and fellow hip-hop artist.  (Tr. at 158, ECF No. 91.)  Little testified that after Kenneth's death, "Dinner Date" was in regular rotation on local radio stations 96.5 and 107.9, and available on iTunes.  (*Id.* at 163-64.)  Moreover, Little testified that he also performed "Dinner Date" in all of his tour locations over the past three years.  (*Id.*)

-26-

"creative," and "intelligent," and that these elements of his personality "reflected in his music as well." (Tr. at 166, ECF No. 91.) While the court is not suggesting that Kenneth would have necessarily achieved the success of an artist like Jay-Z[11], considering the musical success that he demonstrated prior to his death, the court concludes that an estimated life time earning capacity of $500,000 is modest considering the young age at which Kenneth died. Thus, the court would sustain a jury award that includes estimated future earnings up to that amount.

After viewing the evidence in the light most favorable to Plaintiff, the court concludes that the wrongful death jury award in the amount of $4,500,000 is beyond the maximum damages, $3,000,000, that the jury could reasonably award as compensation for the estate for losses suffered by the decedent's surviving parent. Thus, Plaintiff must consent to a remittitur of the wrongful death award to $3,000,000 or the case must be retried. If Plaintiff were to consent to such a remittitur, the total jury award would be in the amount of $4,000,000– $1,000,000 in survivorship damages and $3,000,000 in wrongful death damages, rather than the total of $5,500,000 awarded by the jury. However, if Plaintiff does not consent to a remittitur with fifteen days of this Order, the case must be retried.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion is granted in part and denied in part.

---

[11]    Jay-Z is an American rapper, record producer, and entrepreneur, who has sold more than 100 million records throughout his career. *Jay-Z*, Wikipedia, (Jan. 1, 2016), https://en.wikipedia.org/wiki/Jay_Z.

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

February 5, 2016